UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                  Case No. 19-20398
                                                  Honorable Thomas L. Ludington

v.

MELVIN LAWRENCE,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS AND SCHEDULING DATES

On June 12, 2019, Defendant, Melvin Lawrence, was indicted by a grand jury on one count of being a felon in possession of a firearm. ECF No. 1. The firearm was located on Defendant's person during a traffic stop on May 30, 2019. Defendant was arraigned on June 17, 2019 and on August 21, 2019 he filed a motion to suppress the firearm. ECF Nos. 11, 14. Upon Defendant's reply to his motion, the government sought leave to file a sur-reply and the motion was granted. ECF Nos. 22, 25, 26. The evidentiary hearing on the motion to suppress began on October 8, 2019, was continued to October 17, 2019, and concluded on October 29, 2019. The following reflect the Court's findings of fact based upon its assessment of the evidence received during the hearing.

**I.**

On May 30, 2019, Defendant was the front seat passenger in a Volkswagen Jetta that was being driven by Laquinton Thompson in Saginaw, Michigan. ECF No. 14 at PageID.37. There were two males in the vehicle – the driver and Defendant. *Id.* Two Michigan State Police Troopers, Steven Dehmel and Joseph Boisture, were assigned to the city of Saginaw through the

Secure City Partnership where they were "proactively stopping cars." The Secure City Partnership was initiated by Michigan's Governor and began in Flint, Detroit, and Saginaw. The program places Michigan State Police Troopers in cities with high crime areas and its goal is to stop violent crime before it happens.[1] The officers explained that their objective was to find drugs, guns, and stolen vehicles, but they would only stop vehicles if there was a legitimate question about the legality of specific behavior.[2] Troopers Dehmel and Boisture ran the license plate of the Volkswagen Jetta the Defendant was in through LEIN, a law enforcement database, and discovered three problems with the vehicle – the owner of the vehicle had an outstanding warrant for her arrest, the owner did not have a valid license, and there was no insurance on the vehicle. The troopers activated their lights and the driver pulled the vehicle over into a gas station parking lot.

Both Troopers Dehmel and Boisture exited the police vehicle; Trooper Dehmel approached the driver's side of the vehicle and Trooper Boisture approached the front passenger door to speak with Defendant.[3] After approaching the vehicle, Trooper Dehmel informed the

---

[1] The Secure City Partnership has two components – first, to act as a resource multiplier for local law enforcement in high crime areas and second, to initiate Community Action United Teams in Our Neighborhoods (CAUTION) that connect law enforcement with the faith-based community to "provide a calming influence at sometimes tense crime scenes . . . [and to] serve as a liaison between law enforcement and residents to foster improved communication and information sharing." MICHIGAN STATE POLICE, BOILERPLATE REPORT TO LEGISLATURE: REPORT ON SECURE CITIES PARTNERSHIP (SCP) 1–2 (December 2017), https://www.michigan.gov/documents/msp/SCP_611109_7.pdf.
[2] At the hearing, Defendant sought to have a run sheet introduced that reflected that the officers had not responded to any emergency calls during their shift, but that they stopped seven vehicles during their shift on June 12, 2019. The officers searched all seven vehicles, most of them as a result of driver consent. The run sheet was not admitted because there was no evidence proffered that the stops were random as argued and there was no challenge to the officers' testimony that the stops were initiated with a reasonable basis for the stop. That is the stops were not based on unreliable factors for making a stop such as in David Floyd, et al. v. City of New York, 959 F. Supp. 2d 540 (S.D.N.Y. 2013). In that case, Judge Scheindlin found that furtive gestures and the fact that the stop was conducted in a high crime area alone were insufficient to justify a Terry stop. *Id.* at 580–82. Here, there was testimony that the stop was made in a high crime area but was justified because the owner did not have effective insurance.
[3] The dash cam footage of the incident shows both troopers speaking to the driver and passenger, but the audio mostly records the conversation between Trooper Dehmel and the driver.

driver he was stopped because the owner of the vehicle had a warrant for her arrest and did not have a valid license. At the hearing, Trooper Dehmel explained that he did not tell the driver that the vehicle had no insurance because he does not always share every reason for stopping a vehicle with the driver.

The driver informed Trooper Dehmel that the vehicle belonged to his girlfriend. He furnished his driver's license, registration, and proof of insurance for the vehicle to the officer in response to his request. *See* Government Exhibit 1 at 0:42–1:30. The certificate of no-fault insurance for the vehicle provides the term of coverage from April 26, 2019 to October 26, 2019. Defense Exhibit B. The government later inquired and established in the sur-reply that the auto insurance was cancelled on May 9, 2019. Government Exhibit 3.

In the video, Trooper Dehmel can be heard asking the driver for consent to search his vehicle. Government Exhibit 1 at 2:18–2:20. There is no dispute about the request, "You don't care if I check it out real quick, is that cool?" There is a dispute regarding the driver's response. Trooper Dehmel stated that he heard the driver consent to a search of the vehicle. He testified that he doesn't "recall exactly what [the driver] uttered," but he thinks the response was "'ight, which is slang for all right." However, at the second hearing, Mr. Thompson testified that he initially responded "uh uh" – intending a negative response to Trooper Dehmel's request. Mr. Thompson testified that he never said "all right" because "I don't use all right." Defendant testified that Mr. Thompson "doesn't talk right" and does not use correct words because his friend is from the south and what he described as "country." Defendant testified that Mr. Thompson said "naw" which means "no" in response to Trooper Dehmel's request to search the vehicle. After the driver was asked to exit the vehicle for the vehicle search, Trooper Dehmel did a weapons pat down of the driver after asking for the driver's consent. Mr. Thompson can be

observed in the video nodding his head and lifting his hands off the top of the vehicle, palms upward.

At the same time that Trooper Dehmel spoke with the driver, Trooper Boisture spoke with Defendant. Trooper Boisture asked Defendant for identification and Defendant verbally identified himself as Melvin Lawrence. Boisture wrote down Defendant's name and date of birth on a notepad in order to run his information through LEIN. Defendant advised Boisture that he was recently released from parole. Defendant was polite and talkative throughout the conversation, as was Trooper Boisture. However, Trooper Boisture testified Defendant's demeanor changed when he asked Defendant to exit the vehicle.

Boisture testified that he "heard bits and pieces" of Trooper Dehmel's conversation with the driver asking for consent to search the vehicle and said he heard the driver agree to the search. After Defendant exited the vehicle, Boisture stated he asked Defendant for consent to search his person and Defendant consented. Defendant disputes that assertion, but the video corroborates Trooper Boisture's testimony, not Defendant's.

Immediately after Defendant exited the car, Boisture asked Defendant if he had "anything illegal?" to which Defendant responded "yes", then "no," and then "a gun." Defendant told Boisture specifically where the gun was hidden on his right hip in his waistband, a fact which Boisture was appreciative of because he could not see the weapon just by looking at Defendant. Trooper Boisture "retrieved an unloaded .45 caliber Ruger pistol" from Defendant's hip. ECF No. 18 at PageID.52-53. Defendant was arrested and later charged as being a felon in possession of a firearm. ECF No. 18 at PageID.53. The entire stop, from the time the vehicle pulled into the gas station until the gun was found lasted 3.5 minutes, not including the subsequent search of the vehicle. Motion to Suppress Hearing, October 17, 2019; Government Exhibit 1.

When asked why he and his partner asked for consent to search the vehicle based on LEIN saying there was no valid insurance on the vehicle, Boisture testified that driving a vehicle without insurance is a 93 day misdemeanor. No weapons or illegal drugs were found in the vehicle or on the driver's person.

**II.**

Defendant offers three arguments in support of his motion to suppress – the initial stop of the vehicle was unsupported by probable cause or reasonable suspicion, the stop was unconstitutionally prolonged, and there was no consent to search Defendant's person.

**A.**

Defendant argues the initial stop was unsupported by probable cause of a traffic violation or reasonable belief that criminal activity may be afoot because the driver's girlfriend, the owner of the vehicle was not present. ECF No. 14 at PageID.41. The MSP troopers recorded the fact of no valid insurance on their written reports but did not mention it to the Defendant during the traffic stop. Government Exhibit 1. Additionally, the driver produced a certificate of insurance, which the driver admits he learned after the fact had been cancelled at the time of the traffic stop. Therefore, "because police failed to observe a suspected civil traffic violation . . . they had no probable cause to conduct the traffic stop of the vehicle occupied by Mr. Lawrence." ECF No. 14 at PageID.42. As such, Defendant seeks to have the evidence of the gun suppressed.

The Fourth Amendment to the U.S. Constitution states "[t]he right of the person to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." The U.S. Supreme Court has held that "a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers" during a traffic stop. *Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (citing *Brendlin*

*v. California*, 551 U.S. 249, 255 (2007)). As a result, a police officer "must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity" to initiate a traffic stop. *U.S. v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).

Michigan law provides,

> (2) An *owner or registrant of a motor vehicle* . . . with respect to which security is required, *who operates the motor vehicle* . . . or permits it to be operated upon a public highway in this state, *without having* in full force and effect *security* complying with this section or section 3101 or 3103 *is guilty of a misdemeanor*. A *person who operates a motor vehicle* or motorcycle upon a public highway in this state *with the knowledge that the owner or registrant does not have security* in full force and effect *is guilty of a misdemeanor*. A person convicted of a misdemeanor under this section shall be fined not less than $200.00 nor more than $500.00, imprisoned for not more than 1 year, or both.

MCL 500.3102 (emphasis added). The information in LEIN showed that the vehicle did not have insurance. The officers had probable cause to believe the vehicle was being driven without insurance, a misdemeanor. However, even if that proposition is debatable, it is without question that there was reasonable suspicion that the vehicle was being driven without insurance. Because knowingly driving a vehicle without insurance is a misdemeanor, the police officers had reasonable suspicion that the vehicle was being driven without insurance and can legally initiate a traffic stop. Indeed, if LEIN shows there is no insurance coverage on the vehicle, police officers can impound the vehicle because it cannot be legally driven. *Hastert v. Mercer*, 2015 WL 6394788 at * 1–2 (W.D. Mich. Oct. 22, 2015).

Police officers are allowed to rely upon information in LEIN to conduct an arrest, even if it later turns out the information in LEIN was inaccurate. *Scott v. City of Port Huron*, 2017 WL 877317 at *8 (E.D. Mich. March 6, 2017); *Taggart v. Macomb County*, 587 F. Supp. 1080, 1081–82 (E.D. Mich. 1982); *Shumate v. Cleveland*, 2010 WL 2813334 at *4 (E.D. Mich, July 14, 2010). The Michigan Court of Appeals has held a police officer, relying upon LEIN and his

knowledge, experience, and training, "had at least a reasonable suspicion that defendant was operating his vehicle without insurance, and therefore, the stop and detention to check for valid insurance was reasonable." *People v. Mazzie*, 326 Mich. App. 279, 297 (Mich. Ct. App. 2018); *see also United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004); *Hastert v. Mercer*, 2015 WL 6394788 at *2-3 (W.D. Mich. Oct. 22, 2015).

In summary, the officers checked LEIN which reflected that there was no insurance coverage for the vehicle. Owning and driving a vehicle without insurance is a misdemeanor in Michigan as is knowingly operating a vehicle without insurance. The officers had reasonable suspicion of criminal activity and the traffic stop on the Volkswagen Jetta was lawful.

**B.**

Defendant next argues that once the police officers determined that the owner of the vehicle was not present (the owner was a female, neither the driver nor passenger were), there was no longer any reason to continue the traffic stop. ECF No. 14 at PageID.42-44. Since he argues the stop was unconstitutionally prolonged, Defendant seeks to have the evidence of the gun suppressed.

The length of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). Therefore, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Defendant argues the purpose of the traffic stop was to determine if the female owner of the vehicle was present and after officers learned she was not, the purpose of the stop had concluded and there was no further reason to continue the traffic stop. If LEIN had reflected that the vehicle had valid insurance, that would have been the case. However, the vehicle did not

have valid insurance – LEIN showed the vehicle did not have insurance coverage and further investigation later proved there was no insurance on the vehicle at the time of the traffic stop. When a vehicle lacks insurance, police officers can impound it and have it inventory searched to safeguard the property inside the vehicle. *Mongo v. City of Detroit*, 2018 WL 1168936 at *3–4 (E.D. Mich. March 6, 2018); *Redmond v. Sanders*, 858 F.Supp.2d 809, 820–21 (E.D. Mich. 2012). Since one of the three reasons for the stop was the lack of insurance on the vehicle, the stop did not have to conclude upon learning that the gender of the owner did not match the gender of the driver. Therefore, the request to search the vehicle was not a prolonged stop. Unlike in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), which was cited by Defendant, Defendant was not detained unnecessarily and beyond the scope of the reason for the stop.

## C.

Defendant also challenges the legality of the search of the Defendant's person after the vehicle was stopped and the driver consented to the search of the vehicle. The Court is satisfied based upon the testimony and a careful review of the video that the driver consented to a search of the vehicle and that Defendant consented to a search of his person. Moreover, the officers were entitled to search Defendant's person, even without his consent.

### i.

If a police officer receives consent for the search, "a warrantless search does not offend the Constitution." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008). Consent "must be voluntary and freely given." This means consent is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Moon*, 513 F.3d at 527 (citing *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). Consent to search "is a question of fact to be determined from the totality of all the circumstances." *Moon*, 513 F.3d at 537 (*quoting*

*Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Defendant argues that the government cannot prove consent – because "the Government cannot explain why Mr. Lawrence was ordered out of the vehicle in the first place that precipitated" the search of his person. ECF No. 21 at PageID.75. The argument is not factually corroborated. It was only after the driver gave consent to search the vehicle that Mr. Lawrence was directed out of the vehicle. Police officers may seek consent to search the vehicle for any reason, *Moon*, 513 F.3d at 537, and in this case two different police officers heard the driver give consent to search the vehicle. While the Court would concur that the video is not clear in establishing that the driver's specific language was "all right", the driver's body language after he exited the vehicle and the tone of his voice corroborate his consent to search the vehicle.

**ii.**

Finally, Defendant claims a "mere acquiescence by way of physical gesture" by Defendant is insufficient to prove it was not given under duress. ECF No. 21 at PageID.75. Consent does not have to be given verbally. *United States v. Thurman*, 525 Fed. Appx. 401, 404 (6th Cir. 2013) ("[T]his Court . . . ha[s] held that non-verbal actions, considered with other factors, can constitute voluntary consent to searches . . . ." (internal quotations removed)); *United States v. Taylor*, 1998 WL 109979 at 6–7 (6th Cir. 1998). In this case, the dash cam video reflects Defendant exiting the vehicle, placing his hands behind his back with Trooper Boisture's guidance, a short conversation between Boutine and Defendant, Boutine handcuffing Defendant, and Defendant shifting his weight and thrusting his hip to the right before Boutine removed a gun from Defendant's right hip. Government Exhibit 1 at 3:12–3:45. Also, Trooper Boutine testified that he asked for and received verbal consent from Defendant during the encounter. Trooper Boutine's testimony is corroborated by the video timeline, in part because there would

be no way for Trooper Boutine to know where the gun was and the video reflects his proceeding directly to Defendant's waistband where the firearm was located.

Moreover, Trooper Dehmel believed that he could lawfully search the passenger's person in conjunction with a lawful search of the vehicle. A "stop and frisk" is constitutional and does not violate the Fourth Amendment if one, the investigatory stop is lawful and two, if "the police officer . . . reasonably suspect[s] that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326–67. When applying the *Terry* standard to a traffic stop, the initial investigatory stop and seizure is lawful "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Johnson*, 555 U.S. at 327.

After a vehicle has been lawfully stopped for a traffic violation, as occurred here, "the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). That is true because "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Mimms*, 434 U.S. at 111.

The Supreme Court has held that both the driver and the passenger "may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and dangerous.'" *Johnson*, 555 U.S. at 331 (quoting *Mimms*, 434 U.S. at 112); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Trooper Boutine testified that Defendant's attitude changed after he was asked to step out of the vehicle. Boutine also was aware that Defendant just completed parole. This information, taken together, gave Trooper Boutine reasonable suspicion to frisk Defendant after he was directed to exit the vehicle, regardless of his consent. Trooper Boutine explained that he will ask for consent, even if he has reasonable suspicion to frisk someone because it

generally keeps the interaction more calm. In this case, even if Trooper Boutine did not obtain valid consent, which he did, his knowledge of his location, Defendant's history, and Defendant's change in behavior when asked to exit the vehicle combined rise to the level of reasonable suspicion that Defendant was armed.

**III.**

Accordingly, it is **ORDERED** that the motion to suppress, ECF No. 14, is **DENIED**.

It is further **ORDERED** that a final pretrial conference is **SCHEDULED** for **November 26, 2019 at 2:00 pm** and a jury trial is **SCHEDULED** for **December 3, 2019 at 8:30 am**.

Dated: November 21, 2019     s/Thomas L. Ludington
             THOMAS L. LUDINGTON
             United States District Judge